## PATRICE WARD *v.* KATHY GREENE ET AL.
### (SC 16883)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.[1]

[1] This case originally was heard by a panel consisting of Justices Borden, Katz, Palmer, Vertefeuille and Zarella. Subsequent to the oral argument, Justice Borden was recused and Chief Justice Sullivan was substituted for him. Chief Justice Sullivan read the briefs and listened to the tape of the oral argument.

Argued March 20, 2003—officially released February 3, 2004

*Joseph A. Moniz,* for the appellant (plaintiff).

*Linda L. Morkan,* with whom, on the brief, were *Theodore J. Tucci* and *Deirdre A. Devaney,* for the appellee (defendant Village for Families and Children, Inc.).

*Opinion*

ZARELLA, J. The plaintiff, Patrice Ward, individually and in her capacity as administratrix of the estate of Raegan McBride, brought an action against several defendants including the Village for Families and Children, Inc.,[2] to recover for, inter alia, the wrongful death of McBride, as authorized by General Statutes § 52-555 (a).[3] The plaintiff appeals from the judgment rendered by the trial court in favor of the defendant after it granted the defendant's motion for summary judgment on the plaintiff's wrongful death cause of action. The dispositive issue in this appeal is whether the defendant owed McBride a duty of care by virtue of General Statutes (Rev. to 1997) § 17a-101.[4] We conclude that the

---

[2] The Village for Families and Children, Inc., is the only defendant involved in this appeal. References to the defendant are to the Village for Families and Children, Inc.

[3] General Statutes § 52-555 (a) provides: "In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, provided no action shall be brought to recover such damages and disbursements but within two years from the date of death, and except that no such action may be brought more than five years from the date of the act or omission complained of."

[4] General Statutes (Rev. to 1997) § 17a-101, as in effect at the time of the events that gave rise to this action, provides in relevant part: "(a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and

trial court properly determined that the defendant did not owe a duty of care to McBride. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The defendant is a private, nonprofit organization that contracts with individuals to provide foster care and, prior to 1995, day care to children in need. The defendant contracted with Kathy Greene to provide day care and foster care. In August, 1995, the defendant ended its contract with Greene as a day care provider because it eliminated its day care program. The defendant did, however, continue its contract with Greene as a foster care provider.

Although the record does not indicate what, if any, interest the defendant had in Greene's day care operation prior to ending its day care contract with Greene in 1995, the record does indicate that after the defendant ended its contract with Greene as a day care provider, the defendant: (1) had no ownership interest in Greene's day care facility; (2) did not refer or direct children to Greene's day care operation; (3) did not pay Greene

safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.

"(b) The following persons shall be mandated reporters: Any physician or surgeon licensed under the provisions of chapter 370 or 371, any resident physician or intern in any hospital in this state, whether or not so licensed, and any registered nurse, licensed practical nurse, medical examiner, dentist, dental hygienist, psychologist, school teacher, school principal, school guidance counselor, school paraprofessional, social worker, police officer, clergyman, pharmacist, physical therapist, osteopath, optometrist, chiropractor, podiatrist, mental health professional or physician assistant, any person who is a licensed substance abuse counselor, any person who is a licensed marital and family therapist, any person who is a sexual assault counselor or a battered women's counselor as defined in section 52-146k or any person paid to care for a child in any public or private facility, day care center or family day care home which is licensed by the state. . . ." Unless otherwise indicated, all references and citations in this opinion to § 17a-101 are to that statute as revised to 1997.

for the operation of her day care program; (4) did not supervise Greene in the operation of her day care program; and (5) did not investigate to determine Greene's qualifications to be licensed as a day care provider, or to determine whether her license should be renewed. The state department of public health (public health) was responsible for licensing Greene as a day care provider.

In 1996, the plaintiff sought the services of a day care provider for McBride. The plaintiff learned from a friend that Greene provided day care services out of her home. The plaintiff contacted the public health hotline to determine whether Greene was a qualified day care provider and to see whether any complaints had been made against Greene as a day care provider. The plaintiff was informed by public health that there was nothing in the state's file other than a report that one child had fallen off a bicycle while in Greene's care. In January, 1997, Greene began providing full-time day care services to McBride. While McBride was attending Greene's day care program, Greene remained a licensed foster care provider for the defendant. Thereafter, on February 24, 1997, McBride suffered a head injury while in Greene's care. McBride was taken to a hospital by ambulance and pronounced dead upon her arrival. Edward McDonough, deputy medical examiner for the state, ruled that McBride's death was a homicide. On September 22, 1999, Greene was convicted of manslaughter in the first degree.

Thereafter, the plaintiff brought an action against several defendants for damages arising out of McBride's death. The plaintiff claims that the defendant is liable under the wrongful death statute, § 52-555, for damages arising out of McBride's death. The defendant moved for summary judgment on the ground that it was not liable under § 52-555 because it did not owe a duty of care to McBride. During the course of oral argument

on the defendant's motion for summary judgment, the plaintiff's counsel was asked repeatedly to provide a basis for any duty of care owed to McBride by the defendant. The plaintiff's counsel stated that the duty arose by virtue of § 17a-101, the statute providing for mandatory reporting of suspected child abuse. Acting on the premise that the plaintiff properly alleged a violation of § 17a-101, the trial court went on to determine whether the defendant owed McBride a duty of care under that statute.[5]

The trial court granted the defendant's motion for summary judgment on the plaintiff's wrongful death claim on the basis of its determination that the defendant did not owe a duty of care to McBride under § 17a-101. The trial court reasoned that the class of persons that § 17a-101 was intended to protect is limited to identifiable victims, which the court defined as children who have reported abuse or neglect or about whom reports of abuse or neglect have been made to mandated reporters. Thus, the trial court determined that, since there was no relationship between the defendant and McBride and the defendant had no knowledge that Greene was abusing McBride, McBride was not within the class of persons that § 17a-101 was intended to protect. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Prior to addressing the plaintiff's claim, we address our standard of review. "The standard of review of a trial court's decision granting summary judgment is well established. Practice Book § 17-49 provides that sum-

---

[5] We note that neither party disputes the viability of the plaintiff's wrongful death claim on the ground that a violation of § 17a-101 was not alleged in the pleadings as providing the basis of the duty owed to McBride by the defendant. We will review the trial court's determination, therefore, under the assumption that a violation of § 17a-101 properly was alleged.

mary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Gould* v. *Mellick & Sexton*, 263 Conn. 140, 146, 819 A.2d 216 (2003).

The plaintiff claims on appeal that the trial court improperly failed to recognize that a public policy exists in this state creating a private cause of action for an aggrieved individual where a mandated reporter fails to report instances of suspected child abuse to designated officials or agencies. At oral argument before this court, the plaintiff clarified that her cause of action properly is characterized as a wrongful death cause of action under § 52-555, not a private cause of action under § 17a-101.[6] The plaintiff further clarified that § 17a-101 merely establishes the duty of care owed to McBride by the defendant. The plaintiff contends that the public policy statement set forth in § 17a-101 (a), "[t]o protect children whose health and welfare may be adversely affected through injury and neglect," together with the mandatory reporting provisions set forth in § 17a-101

[6] We note that in count fourteen of the amended complaint, the plaintiff alleged a private cause of action under § 17a-101. That count already had been stricken prior to the summary judgment that is the subject of this appeal. See *Ward* v. *Greene*, judicial district of New London at Norwich, Docket No. X04-CV-99-0120118 (February 21, 2002).

(b), creates a duty of care that extends to children situated similarly to McBride.[7]

As a preliminary matter, we address the defendant's claim that this court should decline to review the plaintiff's claim on the ground that it was inadequately briefed. We recognize that "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Gangemi* v. *Zoning Board of Appeals*, 255 Conn. 143, 179, 763 A.2d 1011 (2001). Nevertheless, while the plaintiff has failed to analyze in depth the issues presented, she has directed our attention to the plain language of § 17a-101 as a source for the claimed duty. In the exercise of our discretion, therefore, we review the plaintiff's claim.

We now review the law regarding a wrongful death cause of action. "The elements of a cause of action . . . for a wrongful death are clear from the explicit language of the statute, which as a statute in derogation of the common law is limited to matters clearly within its scope. . . . The plaintiff must prove not only a violation of a standard of care as a wrongful act, but also a causal relationship between the injury and the resulting death. A causal relation between the defendant's wrongful conduct and the plaintiff's injuries is a fundamental element without which a plaintiff has no case. . . . If the chain of causation of the damage, when traced from the beginning to the end, includes an act or omission which, even if wrongful or negligent, is or becomes of no consequence in the results or so trivial as to be a

---

[7] We note that neither party disputes that the defendant is a mandated reporter pursuant to § 17a-101. Thus, we will not address the issue of whether the defendant is actually a mandated reporter.

mere incident of the operating cause, it is not such a factor as will impose liability for those results." (Citations omitted; internal quotation marks omitted.) *Grody* v. *Tulin*, 170 Conn. 443, 448–49, 365 A.2d 1076 (1976).

A wrongful death cause of action, therefore, requires that the party seeking relief allege an underlying theory of legal fault and that such fault is the proximate cause of the injury. Id. In the present case, the plaintiff alleged the following material allegations in support of her wrongful death cause of action. The plaintiff alleged that: (1) Greene had a contractual agreement with the defendant to provide foster care services; (2) the defendant had received numerous reports that Greene physically abused children in her care prior to the time that Greene provided day care to McBride; (3) the defendant had a duty to report allegations of abuse to the department of children and families (department); (4) the defendant failed to report allegations of Greene's abuse; (5) prior to placing McBride in Greene's care, the plaintiff contacted public health to see if any complaints had been made against Greene and was told that there was nothing in the state's file concerning abuse; (6) Greene subsequently abused McBride, causing her death; and (7) the defendant's actions were the proximate cause of McBride's death.

The allegations in the plaintiff's wrongful death count sound in negligence. "The existence of a duty of care is an essential element of negligence. . . . A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) *Calderwood* v. *Bender*, 189 Conn. 580, 584, 457 A.2d 313 (1983).

The plaintiff in the present case claims that the duty of care owed to McBride by the defendant arises by

virtue of § 17a-101. "Where the court adopts the require-
ments of a legislative enactment as the standard of
conduct of a reasonable person, a violation of the enact-
ment may constitute negligence per se, or create a pre-
sumption of negligence, or make out a prima facie case
of negligence, or constitute evidence of negligence,
depending on the legal doctrine followed in a particular
jurisdiction . . . ." 57A Am. Jur. 2d 669–70, Negligence
§ 743 (1989).

It is unclear in the present case whether the plaintiff
relies on § 17a-101 to establish negligence per se, a
presumption of negligence, a prima facie case of negli-
gence or evidence of negligence. This ambiguity is of
no consequence in the present case, however, because
in determining whether a duty of care is owed to a
specific individual under a statute, the threshold inquiry
for each legal doctrine is whether the individual is in
the class of persons protected by the statute. Thus,
we must determine the class of persons protected by
§ 17a-101.

There is no Connecticut appellate case law that dis-
cusses the scope of the class of persons protected by
§ 17a-101. This case, therefore, presents an issue of first
impression. The plaintiff claims in her brief that the
purpose of § 17a-101 is to protect *all* of the children of
the state. At oral argument before this court, the plaintiff
narrowed her view of the class of persons protected
by § 17a-101 to include, as it applies to the present
matter, all of the children in Greene's care during the
course of the defendant's relationship with Greene
regardless of whether: (1) the children were receiving
day care or foster care services from Greene; (2) the
children were placed in Greene's care by the defendant
or by another individual; and (3) the defendant had
actual knowledge of the abuse of the specific individual.
The plaintiff contends that the public policy statement
set forth in § 17a-101 (a) demonstrates that all such

children are within the class of persons protected by § 17a-101. We disagree.

The policy statement contained in § 17a-101 (a) lends little support for the plaintiff's interpretation of the protected class. The opening line of the statute, for example, provides in relevant part: "The public policy of this state is: To protect children whose health and welfare may be adversely affected *through injury and neglect* . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 17a-101 (a). The plaintiff implies that the use of the plural "children" must mean either "all children" or "all children in the care of the provider." This reading of the statute, however, ignores the ending phrase that provides "may be adversely affected through injury and neglect . . . *and for these purposes* to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to *such child and family*." (Emphasis added.) General Statutes (Rev. to 1997) § 17a-101 (a).

From this reading of the statutory language, we conclude that the policy statement appears to be directed at the child, or children in the case of multiple children placed at risk in a singular incident, who should be the subject of a report of abuse or neglect under the statute and are, accordingly, in need of services. The policy statement thus suggests that the legislature intended to focus on children who *already* have been exposed to conduct that amounts to a reportable event, and we do not find merit in the plaintiff's argument that the statute creates a duty of care to every child who has been in the care of the defendant.

The courts of several other states, with almost identical mandated reporter statutes and under facts analogous to the facts in the present case, also have considered this precise issue and determined that the

class of individuals protected by mandated reporter statutes is limited to the child who has been abused or neglected and is, or should have been, the subject of a mandated report.

The Court of Appeals of Ohio, for example, determined whether individuals other than the child who has been abused or neglected and is, or should have been, the subject of a mandated report could bring a negligence action under Ohio's mandated reporter statute, which is almost identical to Connecticut's statute. *Curran* v. *Walsh Jesuit High School*, 99 Ohio App. 3d 696, 651 N.E.2d 1028 (1995). The court stated: "[The plaintiff] is correct in asserting that failure to perform a statutory duty imposed by [the mandated reporter statute] is actionable. . . . Further, [the plaintiff] is correct that the duty imposed . . . is intended for the protection of individuals rather than for the public in general. . . . [T]he Supreme Court of Ohio addressed the issue stating, the statute is not directed at or designed to protect the public at large, but intended to protect a specific child who is reported as abused or neglected. However, because the statute is intended to protect the specific child who is reported abused or neglected, [the plaintiff] has failed to persuade this court that he has standing to bring a civil claim for [the] alleged breach of the statutory duty . . . .

"Generally, in order to maintain a claim of negligence per se based on the defendant's violation of a statute, the plaintiff must show that he is among the class of individuals that the statute is designed to protect: In an action for neglect of duty it is not enough for the plaintiff to show that the defendant neglected a duty imposed by statute, and that he would not have been injured if the duty had been performed, but to entitle him to recover, he must further show that such duty was imposed for his benefit, or was one which the defendant owed to him for his protection and security,

from the particular loss or injury of which he complains. . . .

"We believe that [Ohio's mandated reporter statute] imposes a duty which is owed solely to the minor child of whom reports[8] have been received concerning abuse or neglect. . . . In so holding, we find instructive the Supreme Court of Ohio's statement . . . that [Ohio's mandated reporter statute] is intended to protect a specific child who is reported as abused or neglected." (Citations omitted; internal quotation marks omitted.) Id., 699–700.

In determining the class of persons protected by a statute, we do not rely solely on the statute's broad policy statement. Rather, "we review the statutory scheme in its entirety, including the design of the scheme as enacted." *Gore* v. *People's Savings Bank*, 235 Conn. 360, 380–81, 665 A.2d 1341 (1995). Other states with similar policy statements also have determined that a reporting statute's broad policy statement does not, by itself, define the class of persons protected by the statute.

The purpose of the Utah reporting statute, for example, is "to protect the best interests of children, offer protective services to prevent harm to the children, stabilize the home environment, preserve family life whenever possible, and encourage cooperation among the states in dealing with the problem of child abuse." *Owens* v. *Garfield*, 784 P.2d 1187, 1191 (1989). Similarly, § 17a-101 (a) provides: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect . . .

---

[8] We note that the use of the phrase "minor child of whom reports have been received concerning abuse or neglect" in *Curran* refers not to the required statutory report itself but to reports made to the mandated reporter concerning abuse and neglect, which give rise to the duty to file a required report under the statute.

to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse . . . ."

The Utah Supreme Court, however, concluded that: "Although the statute is intended to address the problem of child abuse, we are not persuaded that it can be read to create a legally enforceable duty on the part of the [mandated reporter] to protect all children from child abuse in all circumstances. Such a duty would be impossible to perform. The statute sets up procedures to be followed by [mandated reporters] when they are alerted of suspected abuse of identified children, but it does not create a duty on the part of the [mandated reporter] to protect children who are never identified as being in need of protection." *Owens* v. *Garfield*, supra, 784 P.2d 1191.

We similarly look to the substantive provisions of Connecticut's mandated reporter statute, which are focused on individuals who already have been abused or neglected and should have been the subject of a mandated report. For example, the reporting requirements are triggered whenever a mandated reporter "has reasonable cause to suspect or believe that *any child* under the age of eighteen years is in danger of being abused or has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon him by a person responsible for such child's health, welfare or care or by a person given access to such child by such responsible person, or has been neglected, as defined in section 46b-120 . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 17a-101a. Once the requirement to report is triggered, the mandated reporter must report: "(1) The names and addresses of *the child* and his parents or other person responsible for his care; (2) the age of *the child*; (3) the gender of *the child*; (4) the nature and

extent of *the child's injury or injuries*, maltreatment or neglect; (5) the approximate date and time the injury or injuries, maltreatment or neglect occurred; (6) information concerning any previous injury or injuries to, or maltreatment or neglect of, *the child* or his siblings; (7) the circumstances in which the injury or injuries, maltreatment or neglect came to be known to the reporter; (8) the name of the person or persons suspected to be responsible for causing such injury or injuries, maltreatment or neglect; and (9) whatever action, if any, was taken to treat, provide shelter or otherwise assist *the child*." (Emphasis added.) General Statutes § 17a-101d. These provisions, therefore, focus only on the abused child.

Even more compelling is the fact that, once a mandated reporter is aware of suspected abuse or neglect giving rise to a mandatory report, there is not one provision in the statutory scheme that requires the reporter to provide additional information about other children known to the reporter to be in the care of the suspected abuser. If the class of persons protected by § 17a-101 included such children, it would seem logical that the statute would require the reporter to disclose information about other children known to the reporter to be in the care of the suspected abuser.

The confidentiality requirements set forth in General Statutes (Rev. to 1997) § 17a-101k also demonstrate that the class of persons protected by § 17a-101 is limited to the children who have been abused or neglected and are, or should have been, the subject of a mandated report. For example, § 17a-101k provides in relevant part that "[t]he information contained in the reports and any other information relative to child abuse, wherever located, shall be confidential subject to such regulations governing their use and access as shall conform to the requirements of federal law or regulations. . . ." General Statutes (Rev. to 1997) § 17a-101k. Any information

that is gathered concerning the reports of suspected abuse, therefore, is prohibited from public disclosure. Section 17a-101-6 of the Regulations of Connecticut State Agencies[9] sets forth the persons and agencies having emergency and routine access to the information

---

[9] Section 17a-101-6 of the Regulations of Connecticut State Agencies provides: "(a) Persons and agencies having emergency access to the registry. ('Emergency access' means ability to query central registry by telephone and get immediate response by telephone after verifying caller is who he/she says he/she is). ('Routine access' means ability to query central registry and response given by appointment or in writing).

"(1) Only the following persons shall be eligible for both emergency access and routine access to the registry:

"(A) A legally-mandated public or private child protective agency investigating a report of known or suspected child abuse or neglect; or an agency treating a child or family which is the subject of a report of record; or a designated agency under contract to the department of children and families performing such investigation or treatment;

"(B) A police or other law enforcement agency investigating a report of known or suspected child abuse or neglect;

"(C) A physician who has before him a child who he reasonably suspects may be abused or neglected;

"(D) A person legally authorized to place a child in protective custody when such person has before him a child whom he reasonably suspects to be abused or neglected and such person requires the information in registry to determine whether to place the child in protective custody;

"(E) An agency having the legal responsibility or authorization either to care for, treat or supervise a child who is the subject of a report or record, or to care for, treat or supervise a parent, guardian or other person responsible for such child's welfare;

"(2) Additional persons eligible only for routine access to the registry include the following:

"(A) Any person named in the report or record who is alleged to be abused or neglected; if the person named in the report or record is a minor or is otherwise incompetent, his guardian ad litem or conservator;

"(B) A parent, guardian of other person responsible for the welfare of a child named in a report or record or their attorney except that the name or names of persons reporting the incidents of alleged abuse shall not be discharged;

"(C) Subject to the prior approval of the commissioner of the department of children and families or his designee, persons engaged in bona fide research provided, however, that no information identifying the subjects of the report shall be made available unless it is absolutely essential to the research purposes.

"(D) A court, upon its finding that access to such records may be necessary

contained in the abuse registry, and each person or agency authorized to access the information has an official investigative, medical or legal connection to the child who was abused or neglected and was the subject of a mandated report. Thus, children other than the child who is the subject of a mandated report do not directly benefit from the reporting requirements. Notwithstanding the fact that the confidentiality requirements are likely designed to protect the accused abuser, if the statutory scheme truly had been intended to protect children other than the child who is the subject of a mandated report, information relating to reports of abuse would be available to the public in general or, at a minimum, to the parents or guardians of children also in the care of the abuser.

The confidentiality requirements, taken together with the fact that the statute requires that only information relating to the abused or neglected child be reported and not information relating to other known children in the care of the suspected abuser, strongly suggests that the class of persons protected by the statute is limited to the children who have been abused or neglected and are, or should have been, the subject of a mandated report. The plaintiff points to no substantive provisions that are aimed at protecting children other than children who have been abused or neglected and are, or should have been, the subject of a mandated report. From our review of the statutory scheme, we can find only two provisions that arguably benefit children outside this defined and identifiable group.

The first provision is found in General Statutes (Rev. to 1997) § 17a-101j (b), which provides: "Whenever a

for determination of an issue before such court; but such access shall be limited to 'in-camera inspection' unless the court determines that public disclosure of the information contained therein is necessary for the resolution of an issue then pending before it;

"(E) Any appropriate state or local official responsible for carrying out his or her official functions with respect to child protective services."

report has been made pursuant to section 17a-101b and section 17a-103 alleging that abuse or neglect has occurred at an institution or facility that provides care for children which is subject to licensure by the state and the Commissioner of Children and Families, after investigation, has reasonable cause to believe abuse or neglect has occurred, the commissioner shall forthwith notify the state agency responsible for licensure of such institution or facility of such information."

The second provision is found in General Statutes (Rev. to 1997) § 17a-101g, which provides in relevant part: "(a) Upon receiving a report of child abuse as provided in section 17a-101b, the Commissioner of Children and Families, or his designee, shall cause the report to be classified and evaluated immediately. If the report contains sufficient information to warrant an investigation, the commissioner shall make his best efforts to commence an investigation of a report concerning an imminent risk of physical harm to a child or other emergency *within two hours of receipt* of the report. . . .

"(c) If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child *or any other child in the household is in imminent risk of physical harm from his surroundings* and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or his designee, shall authorize any employee of the department or any law enforcement officer to *remove the child and any other child similarly situated* from such surroundings . . . ." (Emphasis added.)

The potential protection afforded under these provisions to those other than the child who is the subject of a complaint of abuse depends on the intervening acts of administrative agencies and is, therefore, remote and speculative. For example, an abusive care provider

might lose his or her license at some indeterminate point in the future, but revocation of a state license to provide care would occur after a substantial investigation and lengthy administrative process, if at all. Thus, the class of children who are protected by the statute and, therefore, owed a duty are not readily identifiable. Similarly, the provision that allows the state agency to remove children similarly situated to a child who has been abused or neglected requires an investigation and a subsequent determination by the agency that there are, in fact, other children similarly situated, and that such children are at imminent risk of harm. Again, there is no way to determine the children, if any, who will benefit from this provision.

Thus, whether these provisions ultimately will benefit children other than the child who has been abused or neglected depends entirely on administrative processes outside the control of the mandated reporter. These provisions, therefore, do not establish a specific and identifiable class. On the basis of the foregoing, we cannot say that a mandated reporter owes a legally enforceable duty to children unknown to the reporter who might stand the remote chance of benefiting from a report of abuse or neglect, where the benefit would depend entirely on the intervening acts of administrative agencies.

Finally, we note that McBride's injuries were, in the abstract, a foreseeable consequence of the defendant's failure to report prior abuse of other children. We have stated, however, that "[t]he conclusion that a particular injury to a particular plaintiff or class of plaintiffs possibly is foreseeable does not, in itself, create a duty of care. . . . Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which

lead the law to say that the plaintiff is entitled to protection. . . . While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." (Citations omitted; internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 576, 717 A.2d 215 (1998).

The public policy concerns inherent in the present case are of profound importance, namely, the protection of children's health and welfare, which may be affected adversely through injury and neglect. We are mindful, however, that extending liability to a mandated reporter for potential future abuse of children, unknown to the mandated reporter, may, in fact, undermine the salutary goals of the statutory scheme.

Specifically, extending the liability of a mandated reporter to such children undoubtedly will result in overburdening with nonmeritorious reports the agencies charged with investigating abuse and neglect claims, which have limited resources. For example, to shield themselves from liability, mandated reporters will feel compelled to report incidents that rightfully should not be reported, thereby diverting valuable resources from the claims that demand immediate attention. In 2003, for example, the department reported that it received 33,630 reports involving 95,214 individual allegations of suspected abuse or neglect. Of these allegations, 20,322 were substantiated after full investigations resulted in findings of reasonable cause to believe that neglect or abuse had occurred. These statistics aptly demonstrate that a vast amount of resources is required to investigate the tens of thousands of

allegations brought to the attention of the department each year.[10]

The legislature obviously was concerned about over-reporting, when in 1997 it amended Connecticut's mandated reporter statute.[11] Up until that time, General Statutes (Rev. to 1997) § 17a-101e (b) shielded reporters from liability when they, in good faith, reported suspected abuse or neglect.[12] With the enactment of Public Acts 1997, No. 97-319, § 12, the legislature opted also to shield reporters from liability when they, in good faith, do *not* report suspected abuse or neglect.[13]

The legislature, therefore, has expressed its desire that reporters use good judgment in reporting suspected

---

[10] See 2003 Department of Children and Families Town Page Report.

[11] During debate on the amendment before the House of Representatives, Representative Ellen Scalettar, in response to an inquiry from Representative Dominic Mazzoccoli, provided the following explanation for amending the statutory language: "[A]t this time there is immunity, this only applies to mandated reporters. A mandated reporter who in good faith makes a report of child abuse and it's proved to be false, that person is immune from liability. There are many cases now though that we have heard about where professional people in particular feel that they must err always on the side of reporting even when in their professional judgment they really don't believe there has been abuse. And so long as they're exercising their professional judgment as a mandated reporter and in good faith don't make a report, this lends some balance to that reporting requirement." 40 H. R. Proc., Pt. 18, 1997 Sess., p. 6594, remarks of Representative Ellen Schalettar.

[12] General Statutes (Rev. to 1997) § 17a-101e (b) provided in relevant part: "Any person, institution or agency which, *in good faith, makes the report . . . shall be immune from any liability, civil or criminal,* which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect." (Emphasis added.)

[13] General Statutes § 17a-101e (b), as it incorporates Public Acts 1997, No. 97-319, § 12, provides in relevant part: "Any person, institution or agency which, in good faith, makes, *or in good faith does not make, the report . . .* shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect." (Emphasis added.)

abuse or neglect. Presumably, one of the legislature's goals in requiring that mandated reporters use good judgment is to ensure that the system does not become overburdened, thereby preventing the agencies charged with investigating suspected abuse or neglect from protecting the children of our state with the required level of efficacy. Essentially, the agencies rely on mandated reporters to filter allegations that cannot be substantiated, which enables the agencies to focus their limited resources on reports that demand immediate attention. Moreover, we have stated that there is a public policy in this state to ensure that limited governmental resources are used efficiently. See *Board of Education* v. *Freedom of Information Commission*, 217 Conn. 153, 161, 585 A.2d 82 (1991). Extending a mandated reporter's liability to children with whom the reporter has no relationship and about whom the reporter has no independent reason to suspect abuse or neglect invariably will result in making reporters less diligent. Mandated reporters will report all potential claims rather than exercising the requisite amount of discretion to determine the validity of such claims. This will further extend the department's resources and increase the risk of deficient action by the agency on claims that warrant attention and action.

On the basis of the foregoing, we conclude that the class of persons protected by § 17a-101 is limited to those children who have been abused or neglected and are, or should have been, the subject of a mandated report. We agree with the trial court, therefore, that the defendant did not owe a duty of care to McBride because she was not within the class of persons protected by § 17a-101.

We conclude that the trial court properly granted the defendant's motion for summary judgment on the plaintiff's wrongful death cause of action because the plaintiff failed to allege a viable theory of legal fault on

the part of the defendant that was the proximate cause of McBride's injuries as required by § 52-555.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and PALMER and VERTEFEUILLE, Js., concurred.

PALMER, J., with whom VERTEFEUILLE, J., joins, concurring. I join the majority opinion. I write separately merely to note that the 1997 amendment to the immunity provisions of General Statutes § 17a-101,[1] though concededly not applicable to the present case, casts serious doubt on whether § 17a-101 gives rise to a private cause of action for negligence in failing to report *irrespective* of whether the party seeking to invoke § 17a-101 falls within the class of persons that the legislature intended to protect. This doubt is predicated on the fact that the 1997 amendment affords immunity for any good faith failure to report under § 17a-101. Public Acts 1997, No. 97-319, § 12, codified at General Statutes § 17a-101e (b).[2] The legislature provided for such immunity because of the highly sensitive, and necessarily discretionary, nature of the reporting requirement. See, e.g., 40 H.R. Proc., Pt. 18, 1997 Sess., p. 6594, remarks of Representative Ellen Scalettar. The imposition of civil liability on a mandated reporter for his or her negligence in failing to report under § 17a-101 seems antithetical to the legislative policy expressed in § 17a-101e (b), as amended.

Although the 1997 amendment is not applicable to the present case, it nevertheless has serious implica-

---

[1] See Public Acts 1997, No. 97-319, § 12 (effective July 1, 1997), codified at General Statutes § 17a-101e (b).

[2] General Statutes § 17a-101e (b) provides in relevant part: "Any person, institution or agency which, in good faith, makes, *or in good faith does not make*, the report pursuant to sections 17a-101a to 17a-101d, inclusive . . . shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed . . . ." (Emphasis added.)

tions for any future case in which a victim alleges the breach of a duty that is predicated upon the reporting requirement of § 17a-101. I wish only to note those potential implications.

Accordingly, I concur.

KATZ, J., dissenting. I disagree with the majority's conclusion that the defendant, the Village for Families and Children, Inc., did not owe a duty of care to Raegan McBride, the deceased two year old daughter of the plaintiff, Patrice Ward.[1] Specifically, I would conclude that the defendant's failure to report allegations of abuse by Kathy Greene, the operator of a child day care with whom the defendant contracted, in violation of General Statutes (Rev. to 1997) §§ 17a-101[2] and 17a-

---

[1] The plaintiff, Patrice Ward, individually and in her capacity as administratrix of the estate of Raegan McBride, her two year old daughter, filed the underlying action against the Village for Families and Children, Inc., Kathy Greene, the department of public health and Stephen A. Harriman, in his capacity as commissioner of public health. Because the issue on appeal pertains only to the Village for Families and Children, Inc., we refer to the Village for Families and Children, Inc., as the defendant in this dissenting opinion. References herein to the plaintiff are to Ward in both her individual capacity and as administratrix of her daughter's estate.

[2] General Statutes (Rev. to 1997) § 17a-101 provides in relevant part: "(a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.

"(b) The following persons shall be mandated reporters . . . any person paid to care for a child in any public or private facility, day care center or family day care home which is licensed by the state. . . ."

Since 1997, the statute has been amended to add other persons as mandated reporters under § 17a-101 (b). See Public Acts 2002, No. 02-138, § 12; Public Acts 2002, No. 02-106, § 3; Public Acts 2000, No. 00-49, § 6.

101a,[3] constituted negligence per se.[4] In my view, a statutorily mandated reporter pursuant to § 17a-101 (b); see footnote 2 of this opinion; who unreasonably fails to report allegations of child abuse, owes a duty of care to both the abused child and to other children who come into the care of the alleged abuser at or near the time of the abuse. Accordingly, I respectfully dissent.

I begin by setting forth the facts that form the background to this issue, as alleged in the plaintiff's amended complaint.[5] The defendant is a private placement agency contracted by the state to provide day care and foster care services to children in the Hartford area. The defendant first placed a child with Greene in a day care capacity in September, 1983, and later that month received a report from that child's caretaker alleging

[3] General Statutes (Rev. to 1997) § 17a-101a provides: "Any mandated reporter, as defined in section 17a-101, who in his professional capacity has reasonable cause to suspect or believe that any child under the age of eighteen years is in danger of being abused or has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon him by a person responsible for such child's health, welfare or care or by a person given access to such child by such responsible person, or has been neglected, as defined in section 46b-120, shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive. Any person required to report under the provisions of this section who fails to make such report shall be fined not more than five hundred dollars."

[4] Although the plaintiff never invoked explicitly the term *negligence per se* as the basis for liability in her amended complaint, the language of both her brief and her amended complaint indicate that she is relying on the defendant's failure to report the incidents of alleged abuse in violation of §§ 17a-101 and 17a-101a as a basis for liability. Moreover, it is clear that the trial court looked to these provisions to determine whether the defendant owed a duty of care to McBride. Indeed, despite footnote 10 of its opinion, the majority implicitly recognizes that §§ 17a-101 and 17a-101a may form the basis for negligence per se by concluding that "the class of persons protected by § 17a-101 is limited to those children who have been abused or neglected and are, or should have been, the subject of a mandated report."

[5] Because this appeal comes to us on a judgment rendered on the defendant's motion for summary judgment, we view the facts in the light most favorable to the plaintiff, the nonmoving party. *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 514, 825 A.2d 72 (2003).

that Greene had struck the child in the face. Greene closed her day care operation the following month. The defendant did not report the allegation to the department of children and families (department).

In 1988, the defendant again hired Greene as a day care provider. In April, 1990, Greene also contracted with the defendant to become a foster parent, and the defendant placed the first foster child in Greene's care in July, 1990. Soon after this placement, the foster child indicated to several persons that, on separate occasions, Greene had beaten her and had pulled her hair out of her scalp. In response, the defendant filled out a critical incident report[6] and sent a social worker to meet with the child. At this meeting, in the presence of Greene, however, the child recanted her story. After further reports of abuse, the child was removed from Greene's home. In 1994, a two year old child sustained a cut on his penis while in Greene's day care. Greene's explanation for the injury was that the child had been cut while on a slide; however, neither the child's pants nor his diaper were torn. The child's mother removed him from Greene's care and reported the incident to the defendant. The defendant did not report the incident to the department. The relationship between the defendant and Greene continued until 1995, when the defendant eliminated its entire day care program. During the course of this relationship, Greene applied for and renewed her day care license with the department of public health four times.

Until McBride's death in February, 1997, the defendant continued to place foster children with Greene, notwithstanding continued allegations of abuse. Specifically, the allegations included that: Greene's daughter

---

[6] From the context of the record, it appears that a critical incident report is a type of internal report used by the defendant when incidents of abuse are alleged.

had slapped and bitten a baby in Greene's care; Greene had bent a child's fingers backward; and Greene had thrown a child across the room by grabbing his neck. Many of these allegations were never reported to the department.

In December, 1996, the plaintiff began inquiring about day care facilities for McBride. In January, 1997, after contacting the department of public health's hotline and learning that no complaints had been made against Greene for abuse, the plaintiff placed McBride in Greene's care. In early February, 1997, the defendant placed an eleven year old foster child with Greene. Shortly thereafter, the foster child complained of being hit twice by Greene, once with a wooden spoon and once with Greene's hand. Although the defendant filled out a critical incident report, it did not report these incidents to the department. On February 24, 1997, after the plaintiff had dropped McBride off at Greene's house for the day, Greene fractured McBride's skull, resulting in her death. With these facts in mind, I turn to the issue of whether the trial court properly granted the defendant's motion for summary judgment on the ground that it did not owe a duty of care to McBride.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 566, 707 A.2d 15 (1998). "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant [breached] that duty in the particular situation at hand." (Internal quotation marks omitted.) *Mendillo* v. *Board of Education*, 246 Conn. 456, 483, 717 A.2d 1177 (1998). "If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from

the defendant." *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384–85, 650 A.2d 153 (1994).

It is well settled that, "under general principles of tort law, [that] a requirement imposed by statute may establish the applicable standard of care to be applied in a particular action. . . . [I]n order to establish liability as a result of a statutory violation, a plaintiff must satisfy two conditions. First, the plaintiff must be within the class of persons protected by the statute. . . . Second, the injury must be of the type which the statute was intended to prevent. . . .

"Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. [It] merely decide[s] whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." (Citations omitted; internal quotation marks omitted.) *Gore* v. *People's Savings Bank*, 235 Conn. 360, 375–76, 665 A.2d 1341 (1995).

I begin with the second prong of the negligence per se test—whether the injury was of the type that the statute is designed to prevent—because that prong is not seriously in dispute. The statement of purpose of the child welfare statutory scheme, which is set forth in § 17a-101 (a) and discussed further herein, clearly reflects an intent to protect children from abuse. Indeed, this provision is contained in chapter 319a of the General Statutes, entitled "Child Welfare," under part I, which sets forth provisions addressing "Dependent and Neglected Children." The entire statutory scheme provides for both remedial and prophylactic

measures targeted toward ascertaining whether abuse has occurred and preventing future abuse. McBride, a two year old child who was fatally injured by Greene, her day care provider, clearly sustained the type of injury intended to be prevented by the statute. Indeed, rather than contest the fact that McBride's injury satisfied this prong of the negligence per se test, the defendant focuses solely on the issue of the scope of liability—whether McBride is in the class of persons the statute intended to protect—which is the first prong of the test. Similarly, the majority does not suggest that the harm inflicted on McBride—a fractured skull at the hands of her day care provider—is not the type of harm that § 17a-101 was enacted to prevent.

Therefore, I turn to the first prong of the negligence per se test, that is, whether McBride is within the class of persons that § 17a-101 is intended to protect. In making this determination, I look to that particular statute, as well as the statutory scheme as a whole, of which § 17a-101 is merely one of the many measures taken by the legislature to protect children from abuse. I would conclude that, as a child in Greene's care at or near the time of the alleged abuse that the defendant failed to report, some of which I previously have set forth herein, McBride was within that class of protected persons.

First, the public policy set forth in § 17a-101 indicates that the reporting statutes apply to all similarly situated children whose health and welfare may be affected, which, in the present case, would include McBride. The statute provides in relevant part: "The public policy of this state is: To protect *children* whose health and welfare *may be adversely affected* through injury and neglect . . . and for [this purpose] *to require the reporting of suspected child abuse*, investigation of such reports by a social agency, and provision of services, where needed, to such child and family." (Empha-

sis added.) General Statutes § 17a-101 (a). This language indicates that the reporting statute is not merely a remedial statute designed to isolate and punish child abusers, but it is also a prophylactic statute. Put another way, the policy articulated in § 17a-101 (a) is not to protect only children who are suspected of being abused or neglected, but *any* child who *may be* subjected to abuse or neglect. Interpreting the statute to include only those children who have already been injured or neglected would be incongruous with a policy to protect children whose health and welfare *may* be so adversely affected.

Indeed, other sections within the statutory scheme bolster the position that §§ 17a-101 and 17a-101a are intended to protect all children similarly situated who are at risk of being abused. After a statutorily mandated reporter generates an initial report of suspected abuse, pursuant to § 17a-101a, General Statutes § 17a-101g (c) provides in part that "[i]f the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from his surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or his designee, shall authorize any employee of the department or any law enforcement officer to remove the child *and any other child similarly situated from such surroundings* . . . ." (Emphasis added.) This language indicates an intent to protect not just children on behalf of whom reports have been received, but also children similarly situated, that is, all children in the care of the suspected abuser. Accordingly, the protective measures set forth in § 17a-101g (c) are consistent with the policy articulated in § 17a-101 (a)—to protect *all* children from potential abuse, not just children who already have been subjected to suspected abuse.

Moreover, General Statutes § 17a-101i[7] requires the suspension, with pay, of an employee accused of child abuse, if after an investigation, the department has reasonable cause to believe that the child has been abused. Had the legislature been concerned *solely* with protecting the particular child who allegedly had been abused, it could have taken the less drastic measure of requiring that the accused employee not have contact with the child in question. Instead, the legislature required that the employee be suspended, thereby

---

[7] General Statutes § 17a-101i provides in relevant part: "(a) Notwithstanding any provision of the general statutes to the contrary, after an investigation has been completed and the Commissioner of Children and Families, based upon the results of the investigation, has reasonable cause to believe that a child has been abused by a school employee who holds a certificate, permit or authorization issued by the State Board of Education, the commissioner shall notify the employing superintendent of such finding and shall provide records, whether or not created by the department, concerning such investigation to the superintendent who shall suspend such school employee. Such suspension shall be with pay and shall not result in the diminution or termination of benefits to such employee. Within seventy-two hours after such suspension the superintendent shall notify the local or regional board of education and the Commissioner of Education, or the commissioner's representative, of the reasons for and conditions of the suspension. The superintendent shall disclose such records to the Commissioner of Education and the local or regional board of education or its attorney for purposes of review of employment status or the status of such employee's certificate, permit or authorization. . . .

"(b) After an investigation has been completed and the Commissioner of Children and Families, based upon the results of the investigation, has reasonable cause to believe that a child has been abused by a staff member of a public or private institution or facility providing care for children or private school, the commissioner shall notify the executive director of such institution, school or facility and shall provide records, whether or not created by the department concerning such investigation to such executive director. Such institution, school or facility may suspend such staff person. Such suspension shall be with pay and shall not result in diminution or termination of benefits to such employee. Such suspension shall remain in effect until the incident of abuse has been satisfactorily resolved by the employer of the staff person. If such staff member has a professional license or certification issued by the state, the commissioner shall forthwith notify the state agency responsible for such license or certification of the staff member and provide records, whether or not created by the department, concerning such investigation. . . ."

removing him or her from the presence of *all* the children at the place of employment. Similarly, the statutory scheme provides for the revocation of a child care license as a preventive measure against further abuse of children other than the child already suspected of having been abused. See General Statutes § 17a-151. I interpret these directives, therefore, as protecting not only the allegedly abused child, but also all children similarly situated to that child.

Second, an implicit goal of this statutory scheme is to encourage the reporting of alleged incidents of child abuse. Indeed, the child welfare system cannot work without such reporting, as the regulation and licensing of child care providers and the prevention of abuse require information that, in many cases, can be provided only by the persons statutorily designated as mandated reporters. See General Statutes § 17a-145 et seq. Therefore, to ensure that these mandated reporters fulfill this duty, the legislature insulated them from certain liabilities that might arise as a result of reporting instances of child abuse and neglect. Specifically, it limited liability for inaccurate reports made in good faith; General Statutes (Rev. to 1997) § 17a-101e (b);[8]

---

[8] General Statutes (Rev. to 1997) § 17a-101e (b) provides: "Any person, institution or agency which, in good faith, makes the report [of abuse or neglect] pursuant to sections 17a-101a to 17a-101d, inclusive, and section 17a-103 shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect."

In 1997, the legislature amended § 17a-101e (b) by adding a provision also to immunize a mandated reporter who in good faith *does not* make a report of abuse or neglect. Public Acts 1997, No. 97-319. § 12. Therefore, in cases involving negligence per se pursuant to § 17a-101, as in the present case, the defendant may avoid liability upon proof of a valid excuse or justification. See 2 Restatement (Second), Torts § 288A, pp. 32–33 (1965). A mandatory reporter who negligently has failed to act in accordance with the statute may assert good faith as an excuse and thereby avoid liability. See *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 150, 491 A.2d 389 (1985).

The majority relies upon the 1997 amendment as evidence that the legislature was concerned about overreporting and that recognizing a broader

and prevented employers from retaliating against an employee for making a report of child abuse. General Statutes § 17a-101e (a).[9] By providing such protections to statutorily mandated reporters, it is evident that the legislature sought to allay fears of adverse repercussions that might be associated with reporting. In other words, these protections are designed to encourage reporters to err on the side of caution, by making reports of abuse, even if they only *suspect* that abuse is occurring.

The majority points to two provisions in the child welfare statutory scheme that prescribe the nature of the event that triggers the reporting requirement; General Statutes (Rev. to 1997) § 17a-101a; see footnote 3 of this dissenting opinion; and the information that the reporter must provide in the report; General Statutes § 17a-101d; as support for its conclusion that a duty is owed solely to the child who is the subject of the report—the child of whom abuse already is suspected.

---

class to include victims like McBride would overburden the system contrary to legislative intent. The legislative history indicates, however, that the legislature merely was attempting at that time to add "some balance" in recognition of the many unsubstantiated claims that require investigation. See 40 H.R. Proc., Pt. 18, 1997 Sess., p. 6586, remarks of Representative Robert Farr; id., p. 6594, remarks of Representative Ellen Scalettar. Nothing in this history reflects a diminution in legislative concern about *underreporting*. Indeed, the provision ensuring confidentiality of abuse reports; see General Statutes § 17a-101k; further indicates that the legislature wanted to encourage even the reporting of abuse that ultimately might not be substantiated. Finally, I note that it is evident that the failure to report abuse when there is a reasonable basis to conclude it has occurred is far greater than the ramifications of overreporting such claims, even when some of those claims ultimately prove to be false.

[9] General Statutes § 17a-101e (a) provides: "No employer shall discharge, or in any manner discriminate or retaliate against, any employee who in good faith makes a report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103, testifies or is about to testify in any proceeding involving child abuse or neglect. The Attorney General may bring an action in Superior Court against an employer who violates this subsection. The court may assess a civil penalty of not more than two thousand five hundred dollars and may order such other equitable relief as the court deems appropriate."

Although these provisions address only the child who is the subject of the report, other provisions addressing the purpose and ramifications of reporting as I previously have discussed bear directly on the issue of duty.

Indeed, the majority recognizes that the statutory scheme prescribes further measures that could suggest a duty that extends beyond the child that is the subject of the report. See General Statutes § 17a-101j (b) (investigation by commissioner of children and families of allegations of abuse and, after finding reasonable cause to substantiate report, notification of state agency responsible for licensure of child care institution or facility); General Statutes § 17a-101g (authorizing department after investigating report of abuse to remove from household all children in imminent risk of harm). The majority dismisses these provisions, however, because they depend on actions by independent entities other than the mandated reporter and, therefore, the possibility of preventing abuse of children other than those who are the subject of the report is "remote and speculative" in that these other children are "not readily identifiable." This reasoning is circular. According to the majority, the class of other children likely to be at risk of abuse is not identifiable because no investigation took place, and no investigation leading to the disclosure of children at risk of abuse took place because no report was filed.

The majority also relies for support on General Statutes § 17a-101k and its supporting regulation, which impose confidentiality requirements on the disclosure of reports of abuse, limiting the persons to whom such information can be disclosed. The majority concludes that, because this information is not available to the public at large, parents of children who also are in the care of the alleged abuser do not have access, and therefore do not benefit from, this information. This

reasoning is equally flawed because it goes to the issue of causation, not duty. Although a parent may not receive the information and thereby *directly* benefit from the report, the actions by state agencies upon receipt of information in the mandated report otherwise may prevent future instances of abuse by revoking the abuser's child care license; see General Statutes § 17a-151; or by suspending or terminating the employment of the abuser. See General Statutes § 17a-101i.

Accordingly, I would conclude that children similarly situated to a child of whom abuse reasonably is suspected are within the class of persons that the statute is intended to protect. This construction is supported by analogy to an area of our common law wherein we have had to delineate the scope of a foreseeable class of victims. We have determined that, in order to impose liability on a municipal employee who presumptively enjoys immunity in the performance of discretionary governmental acts, a plaintiff must show the existence of circumstances that "make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ." (Internal quotation marks omitted.) *Mulligan* v. *Rioux*, 229 Conn. 716, 728, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 15 (1995); *Burns* v. *Board of Education*, 228 Conn. 640, 645, 638 A.2d 1 (1994); *Sestito* v. *Groton*, 178 Conn. 520, 528, 423 A.2d 165 (1979). "We have construed this exception to apply not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims." *Burns* v. *Board of Education*, supra, 646. "In delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim. E.g., *Evon* v.

*Andrews,* [211 Conn. 501, 507–508, 559 A.2d 1131 (1989)]. Other courts, in carving out similar exceptions to their respective doctrines of governmental immunity, have also considered whether the legislature specifically designated an identifiable subclass as the intended beneficiaries of certain acts; see, e.g., *Halvorson* v. *Dahl,* 89 Wash. 2d 673, 676, 574 P.2d 1190 (1978); whether the relationship was of a voluntary nature; *McLeod* v. *Grant County School District,* 42 Wash. 2d 316, 319, 255 P.2d 360 (1953); the seriousness of the injury threatened; *Irwin* v. *Ware,* [392 Mass. 745, 756, 467 N.E.2d 1292 (1984)]; the duration of the threat of injury; id.; and whether the persons at risk had the opportunity to protect themselves from harm. Id." *Burns* v. *Board of Education,* supra, 647–48.

Applying these factors to the circumstances of this case, I would conclude that " '[c]onsiderations of public policy [that] . . . undergird the judicial determination of the scope of duty in the law of negligence' "; *Jacoby* v. *Brinckerhoff,* 250 Conn. 86, 97, 735 A.2d 347 (1999); likewise suggest that children in the care of an abuser, *at or near the time* that another child's abuse went unreported by a mandatory reporter, are intended beneficiaries of §§ 17a-101 and 17a-101a. It should be apparent to any statutorily mandated reporter that his or her failure to act, when there is a reasonable basis on which to conclude that abuse has occurred, would be likely to subject other children then in the abuser's care to imminent harm.[10] These children are similarly situated to the child who has been abused and are equally deserving of protection.

Moreover, concluding that the defendant had a duty of care to children similarly situated to other children

---

[10] Indeed, under the majority's reasoning, the mandated reporter would owe no duty to a sibling of a child who had been abused unless the reporter knew that the abuser in fact had other children in his care.

allegedly abused by Greene, like McBride, is consistent with the goal of the statutory scheme—the protection of children. "An equally compelling function of the tort system is the prophylactic factor of preventing future harm . . . . The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 579, 717 A.2d 215 (1998). In my view, the use of a negative incentive—specifically, that the failure to report reasonable suspicions of abuse will result in potential liability—in the absence of good faith, is consistent with the statutory scheme and helps promote this state's public policy of protecting all children from abuse.

Finally, I recognize that there exists a legitimate concern of attenuation, that is, that the attenuation between a defendant's conduct and a plaintiff's harm is too remote, as a matter of public policy, to impose a duty. See *Gomes* v. *Commercial Union Ins. Co.*, 258 Conn. 603, 616–17, 783 A.2d 462 (2001). That is not the case here. Greene's conduct demonstrated a pattern of abuse, the last known incident occurring within a few weeks of McBride's death. In the present case, we need not decide to what extent *every* child who has in the past or will at some time in the future come into the care of a suspected abuser falls within the class of persons that the statutory child abuse scheme is intended to protect. In this particular case, McBride clearly was imminently at risk.

Accordingly, I respectfully dissent.