This case raises basic questions concerning the permissible scope under the fourth amendment of a search incident to a lawful arrest. The relevant facts are essentially undisputed. On *Page 130 
the afternoon of February 5, 1976, police arrived at the house of the defendant. The state conceded that no search warrant was in existence at or prior to the forcible entry into Donald Duhaime's residence. A large group of police and undercover agents dressed in shabby civilian attire, and numbering fourteen in all, entered the defendant's home and laid siege to it for several hours.[1] The testimony of a witness who, with her two young children, was an occupant of the premises at the time of the entry and search was credible and reliable. Her account of the events during the search was trustworthy and her demeanor on the witness stand impressed the court as completely worthy of belief. She testified that "[a]t the time [February 5, 1976, at about 3:30 p.m.] the front door came flying open and these strange men who [sic] I had never seen before came charging into the house with guns in their hands. One of them ran over to A[2] with his gun pointed directly in A's face, grabbed A by the throat, pulled him forward, pushed him back and threw him down on the floor. Another one of these men ran over to B with his gun in hand, pointed it at B's head, threw B against the living room wall and then at that point I turned and went into my childrens' room." She described "these men" as "dressed in dungarees, flannel shirts, like boots or sneakers, and they had their guns. I didn't know who they were." She went on to say that they had "[n]o badges at all." She was asked "whether or not there was any demand for entry from the outside," to which she replied, "No, there was none." She was asked, "Was there any demand for admission?" and she replied, "No, there was not." The *Page 131 
officers, in making the forcible entry, split the framing on the door. The hinges on the door were pulled out, the door itself was split, and the lock was broken. Upon entry, A "was grabbed by the throat while a gun was pointed at his head." He was then thrown to the floor. The same witness further testified: "I was terrified. I didn't know who these men were that came into my house. After the police `grabbed' A they grabbed B.[3] He [the undercover agent] had his gun pointed at B's head and he threw B against the living room wall." At the time of the entry, Donald Duhaime was in his bedroom. In answer to the question of whether a search of the house was conducted, the witness testified as follows: "Well, I found in the kitchen that my cabinets, dishes, food and canned articles were all displaced. I found a can of coffee that had been opened and dumped on my counter. I found cigarette butts that had been extinguished on my kitchen floor. I found in the living room more cigarette butts that had been extinguished on my rug. The couch cover had been torn off. I found a tear on the back of the couch and the covering had been torn. In the master bedroom, the mattress and box spring had been twisted in opposite directions. The sheets and blankets had been in a heap. Clothing in the closet knocked to the floor; shoes in the closet had been scattered. Personal belongings in the closet had been pulled down, gone through and scattered on the floor. The dresser drawers had been left open, all the clothing inside was all rumpled. There were some personal papers of Donald's that had been searched and left on the floor. The door to the spare room had been *Page 132 
broken, some of the framing cracked; the lock was broken. . . . There were boxes of Christmas tree ornaments and some clothing on the shelves that had been pulled down and left on the floor. There was a bag of children's toys that had been dumped and left on the floor. The back door to the house had the trimming broken; it was so badly split that I had to use a board nailed across it to keep it shut." She also testified "that my wallet had been gone through and my purse had been searched." The police also broke the lock of her miniature hope chest which was located in the master bedroom on top of the dresser. No contraband or weapons were found in her purse, and nothing was found in the miniature hope chest. In addition, the police broke into and searched her silver jewelry case where she kept her rings. Nothing was found in the jewelry case. In answer to the court's inquiry as to what she thought was happening, she replied: "I don't know. I did not know who they were or what they wanted. I never seen [sic] them before. I was frightened. And after I saw how they . . . attacked A or B, I couldn't begin to imagine what they might do to my children or myself." No room in the Duhaime residence was left untouched. The entire search lasted "about an hour to an hour and a half."[4]
After completing the search, the police seized numerous items, including quantities of marihuana and of hashish. Both Donald Duhaime and A were arrested. The defendant Donald Duhaime, in a three-count information, was charged with (1) illegal possession of a controlled substance (marihuana); (2) illegal possession of a controlled substance (hashish) with intent to sell; and (3) conspiracy to violate state narcotics laws. The defendant A, in a two-count information, was charged *Page 133 
with (1) illegal possession of a controlled substance (marihuana); and (2) conspiracy to violate state narcotics laws.[5]
By his amended motion to suppress, the defendant seeks to suppress as evidence, pursuant to the provisions of § 54-33f of the General Statutes, certain specific items and articles seized during the search of his home. In his motion, the defendant has expressly alleged that he was arrested without a valid search warrant and in violation of his rights under the fourth amendment to the federal constitution and under article first, § 7, of the Connecticut constitution. By way of relief, the defendant has moved for an order to suppress the articles seized during the search of his home.
The federal and state constitutional provisions cited in the motion are substantially similar. Both prohibit unreasonable searches and seizures and the issuance of search warrants unless they are based upon probable cause, are supported by oath, and contain a reasonable description of the place to be searched and the things to be seized. Section 54-33f
expressly provides for a motion to suppress as a consequence of the decision in Mapp v. Ohio,367 U.S. 643. Section 54-33f "is analogous to the federal practice under Rule 41(e) of the Federal Rules of Criminal Procedure." State v. Mariano, 152 Conn. 85,90. In other words, § 54-33f is an implementation of the fourth amendment to the federal constitution and article first, § 7, of the Connecticut constitution.
At the pretrial evidentiary hearing, the state conceded that no search warrant was in existence at the time of or prior to the forcible entry into *Page 134 
Donald Duhaime's home. That raises the question of whether the warrantless search of the defendant's entire house can be constitutionally justified as incident to the arrest.
Perhaps no body of the law has been the subject of more change and difficulty in interpretation. Even Mr. Justice Stewart conceded that "[t]he decisions of this Court bearing upon that question have been far from consistent, as even the most cursory review makes evident." Chimel v. California,395 U.S. 752, 755. Probably the best and most useful, compact but comprehensive discussion of the law of the fourth amendment is that of Professor LaFave. LaFave, "Search and Seizure: `The Course of True Law . . . Has Not . . . Run Smooth,'" 1966 U. Ill. L. Forum 255; see LaFave, "Warrantless Searches and the Supreme Court: Further Ventures Into the `Quagmire,'" 8 Crim. L. Bull. 9, 20-23. In a recent decision, the United States Supreme Court concluded that "it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony." Coolidge v. New Hampshire, 403 U.S. 443,483.[6] The provisions of both § 54-33f and the fourth amendment operate to exclude evidence which might be inherently trustworthy in order to discourage abuses of power by the government in conducting searches and seizures. See, e.g.,Davis v. Mississippi, 394 U.S. 721; United States
v. Wade, 388 U.S. 218. Although the exclusionary rule has received criticism from the highest judicial level,[7] the use of that type of procedural safeguard *Page 135 
rightly has been recognized as indispensable to a democratic society.[8] The power to search the premises of a citizen is a drastic one. For that reason the law provides that an impartial magistrate shall intervene between the police and the citizen before the remedy of a search warrant shall be granted.Johnson v. United States, 333 U.S. 10, 13.
It is now well settled that a search may be performed without a warrant if made incident to a lawful arrest. But the importance of confining warrantless searches to carefully drawn exceptions was stressed again recently by Mr. Justice Stewart speaking for a sharply divided court in Coolidge
v. New Hampshire, 403 U.S. 443, 454: "Thus the most basic constitutional rule in this area is that `searches conducted outside the judicial process, without prior approval by judge or magistrate, areper se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' The exceptions are `jealously and carefully drawn,' and there must be `a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' `[T]he burden is on those seeking the exemption to show a need for it.' In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values it represents may appear unrealistic or `extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won — by legal and constitutional means in England, and by revolution on this continent — a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban *Page 136 
and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important."
In Chimel v. California, 395 U.S. 752,[9] the United States Supreme Court overruled Harris v. UnitedStates, 331 U.S. 145, in a decision which narrows the scope of a permissible search incident to an arrest. The court in Chimel held that a warrantless search may be conducted in premises in which a bona fide arrest is made, but that such a search must be limited to the area into which the person arrested might reach for weapons or for destructible evidence. The Supreme Court there spelled out in considerable detail the scope of a permitted search incident to an arrest taking place on premises. "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area `within his immediate *Page 137 
control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs — or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The `adherence to judicial processes' mandated by the Fourth Amendment requires no less." Chimel v. California, supra, 762-63. See Katz v. United States, 389 U.S. 347,357; 3 Wright, Federal Practice Procedure § 668.
Two recent United States Supreme Court cases decided since Chimel have further narrowed the scope of warrantless searches. In Vale v. Louisiana,399 U.S. 30, the court ruled that no search may be conducted on premises incident to the arrest of the occupant outside the premises. And in Coolidge
v. New Hampshire, 403 U.S. 443, the court held that the seizure of a car parked in the driveway could not be justified as incident to the arrest inside the house. The police could not seize the car on the theory that it was in "plain view" where they had ample opportunity to obtain a valid warrant, where they knew in advance the car's description and location, where they intended to seize it when they entered the defendant's premises, and where no contraband or dangerous objects were involved in the search.
Thus, even where a search is made incident to a valid arrest inside the premises, the officers must resort to a magistrate to conduct a full search, except in "exigent circumstances." There is no principle more firmly rooted in our constitutional *Page 138 
jurisprudence than that a warrantless search is presumptively illegal. The burden, then, is on those seeking an exemption to show the need for it, and it is a "heavy" burden that must be met. UnitedStates v. Jeffers, 342 U.S. 48, 51; United States v.Gamble, 473 F.2d 1274, 1276 (7th Cir.).
Because Chimel v. California, supra, limits the police in what they may do after arresting the defendant in his home, the question of what the police may do before the arrest or attempted arrest takes on added importance. In Warden v. Hayden,387 U.S. 294, although the court below had suggested that the warrantless search of the house could be sustained as incident to the arrest, the Supreme Court preferred to rely on the "exigent circumstances" which justified the entry into and search of the house in "hot pursuit," where it is generally agreed that police may enter a person's house and look about for him, although there is some uncertainty as to how likely it must appear to the police that the defendant is there. In People
v. Eddington, 23 Mich. App. 210, aff'd 387 Mich. 551, a warrantless entry of the defendant's apartment for the purpose of arresting him was permissible although the officer was told that he was not at home. The officer had "probable cause to arrest defendant and . . . a reasonable belief that defendant was at home" because the defendant's car was parked nearby and footprints in the snow led to the apartment door, so that the discovery of evidence during the course of the search for the defendant therein was held not to have been an unreasonable search. Other examples where warrantless searches have been judicially sanctioned areStoner v. California, 376 U.S. 483 (search with consent);Abel v. United States, 362 U.S. 217 (deportation);United States v. Mitchell, 322 U.S. 65 (search with consent); Hester v. United States, *Page 139 265 U.S. 57 (open field); Vauss v. United States, 370 F.2d 250
(D.C. Cir.) (saving lives); Blefare v. UnitedStates, 362 F.2d 870 (9th Cir.) (border search);United States v. Barone, 330 F.2d 543 (2d Cir.), cert. denied 377 U.S. 1004 (loud screams in the dead of night); Landau v. United States Attorney,82 F.2d 285 (2d Cir.) (border search); United States
v. Dorman, 294 F. Sup. 1221 (D. D.C.) (saving lives).
The state's basic claim is that "exigent circumstances" existed to justify the prompt police action, including breaking and entering into a constitutionally protected area, without the benefit of a search warrant, for the purpose of preventing the destruction of vital evidence. If it is assumed that the state is correct in asserting that the search of Duhaime's home was justified on the ground of "exigent circumstances," the next question is that of the extent and scope of the search. The scope of a permissible search of premises depends on a number of variables, e.g., whether the premises are used for residence or for business, whether the search centers on particular items and on particular portions of the premises, and whether the person subjected to the search is in exclusive control of the premises.
Mr. Justice Stewart in Chimel v. California,
supra, noted with approval (p. 767) that "the general point so forcefully made by Judge Learned Hand in United States v. Kirschenblatt, 16 F.2d 202
[2d Cir.] remains: `After arresting a man in his house, to rummage at will among his papers in search of whatever will convict him, appears to us to be indistinguishable from what might be done under a general warrant; indeed, the warrant would give more protection, for presumably it must be issued by a magistrate. True, by hypothesis the power would not exist, if the supposed offender *Page 140 
were not found on the premises; but it is small consolation to know that one's papers are safe so long as one is not at home.'"
The application of sound fourth amendment principles to the facts of this case produces a clear result. "The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore, `unreasonable' under the Fourth and Fourteenth Amendments. . . ." Chimel v.California, supra, 768.
This is an appropriate case for suppression because the facts disclose, as they would in few other cases, the casual arrogance of those who have the untrammeled power to invade one's house and make such a sweeping, all pervasive search without the benefit of a search warrant.
 The motion to suppress must be and is hereby granted.