******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ALVORD, J., concurring in part and dissenting in part. I agree with parts I, III and IV of the majority opinion, which conclude that the trial court properly rendered summary judgment on the claims of the plaintiff, Annemarie Morrissey-Manter, that the defendants, Saint Francis Hospital and Medical Center, and Saint Francis Care, Inc., improperly terminated her employment because she had an implied contractual agreement that prohibited her discharge without cause, that the defendants breached the covenant of good faith and fair dealing because she was discharged without cause, and that the defendants withheld evidence and destroyed evidence that would have supported her cause of action. As fully discussed in the majority opinion, the plaintiff did not present sufficient evidence to set forth genuine issues of material fact with respect to those claims.

I disagree, however, with part II of the majority opinion, which concludes that summary judgment was properly rendered with respect to her claim that the defendants terminated her employment in violation of an important public policy. I conclude that an important public policy was alleged in her complaint, i.e., saving a life under exigent circumstances, and that the plaintiff submitted sufficient evidence to set forth a genuine issue of material fact with respect to that claim. I disagree with the majority opinion that she abandoned that express claim of public policy and, accordingly, I would review that claim and reverse in part the judgment of the trial court.

In her complaint, the plaintiff alleged that (1) "allowing an employer to terminate an employee for saving a man's life is against public policy," and (2) "the defendants' attempt to cover up their liability exposure, by firing the one person who stepped up to the plate to save a man's life, is improper and violates public policy." In their motion for summary judgment, the defendants claimed that the plaintiff had "not alleged an established public policy" and that she should not "be immunized from an adverse employment action for allegedly saving a patient's life . . . ." At the hearing before the trial court on their motion, the defendants' counsel argued that the plaintiff had altered medical equipment, which was against hospital policy, and that her termination from employment was therefore proper even if she did save a patient's life. The trial court agreed: "While the plaintiff argues that she was terminated in an effort to cover up possible medical malpractice committed by the defendants' other employees, she has proffered no evidence of this alleged malpractice beyond simply speculating that it occurred; nor has the plaintiff cited a relevant public policy that was violated

by her termination under the circumstances."[1]

The majority concludes that the plaintiff abandoned this ground of an alleged public policy of saving lives and, instead, it focuses on the alleged public policy against covering up medical malpractice, as reflected in General Statutes § 19a-127n, and the alleged public policy against terminating an employee to cover up the employer's negligence. At oral argument before this court, the plaintiff identified those claims of public policy as "alternative" bases for her claim of wrongful discharge. She expressly reaffirmed that the public policy of saving lives under exigent circumstances was her primary claim. Indeed, during the oral argument, no mention whatsoever was made of § 19a-127n. The defendants did not claim that she had abandoned her alleged public policy of saving lives. Instead, they criticized the plaintiff for failing to articulate clearly which public policy argument she was relying on for her claim.[2]

I agree that the plaintiff's appellate brief is less than exemplary when it comes to the briefing of this claim, yet, I believe that it is fairly presented by the record because of the allegations in the complaint, her arguments in opposition to the motion for summary judgment before the trial court, and her affirmation before this court during oral argument. See *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 67 n.12, 23 A.3d 668 (2011). For those reasons, I conclude that the plaintiff did not abandon her claim that her discharge was in violation of the important public policy of saving lives under exigent circumstances, and thus I choose to address it.[3]

The following legal principles are relevant to the plaintiff's claim. "Our Supreme Court has recognized an exception to the general rule regarding at-will employment in which an at-will employee may have a cause of action when the employee alleges a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Internal quotation marks omitted.) *Gagnon* v. *Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 844, 888 A.2d 104 (2006). "The public policy exception to the at-will employment doctrine, however, is to be construed narrowly. . . . Under that narrow exception, the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy. . . . In evaluating such claims, our Supreme Court has looked to see whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy. . . . A cognizable claim for wrongful discharge requires the plaintiff to establish that the employer's conduct surrounding the termination of the

plaintiff's employment violated an important public policy." (Citations omitted; internal quotation marks omitted.) Id.

Our Supreme Court has recognized a public policy limitation on the traditional at-will doctrine in an effort to balance the competing interests of employers and employees. *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 698, 802 A.2d 731 (2002). Additionally, it recognized "the inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contours of the public policy exception." Id., 699. "The issue then becomes the familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not. We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers." *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 477, 427 A.2d 385 (1980).

The plaintiff's complaint alleged that the patient arrived via ambulance from another hospital at the defendants' emergency department in an unstable condition, that the ambulance crew took the necessary pacing equipment with it and left the patient "not paced," that the pacer wire hanging from the patient's neck was not connected, that the external pacer pads applied to the patient were insufficient to pace his heart, that the plaintiff was recruited to assist the patient's assigned team because of her experience, that she tried to connect the pacer wire into the hospital's own pacer device but it would not fit because of the plastic sheathing at the end of the pacer wire, and that she trimmed back the plastic and was then able to plug it into the hospital's pacer, thereby saving the patient's life.

In her objection to the defendants' motion for summary judgment, as supplemented, the plaintiff submitted her affidavit that added the following information. Members of the nursing staff had attempted to attach the patient's pacer wire to the hospital's pacer box, but were unsuccessful because the wire did not fit and there was no adapter available to make the connection; recognizing that the patient was in "imminent danger of death," the plaintiff removed a portion of the plastic sheathing on the pacer wire to make the connection to the pacer box; the patient's vital signs immediately began to stabilize; and the plaintiff was commended by the medical staff present, including the charge nurse on duty, for her actions.

The plaintiff also submitted transcript excerpts from depositions taken in this action to support her objection to the motion for summary judgment.[4] Diane Trudeau, a manager in the defendants' human resources department, testified that the disciplinary action form, dated June 6, 2012, accurately depicted the events that led to the plaintiff's termination of employment. That form, as previously discussed, stated that the patient was in unstable condition, had a very low heart rate, and had low blood pressure. Additionally, the form stated that the nursing staff attempted to attach the patient's pacer wire to the hospital's temporary pacer box, but that it did not fit. Further, while other nurses were "troubleshooting," the plaintiff came into the room to offer support and cut a small amount of the plastic sheathing from the pacer wire, establishing a connection with the pacer box. After the connection was made, the patient's blood pressure improved, and he stabilized. The defendants' disciplinary action form, therefore, corroborates several of the plaintiff's allegations in her complaint and in her affidavit in opposition to the defendants' motion for summary judgment.

The submitted excerpt from the deposition transcript of Gilda Cabral, a nurse manager, addressed the problem of a missing adapter. Cabral testified that the plaintiff, instead of altering medical equipment by cutting the plastic sheathing from the pacer wire, should have "retrieve[d] an adapter." Cabral was then asked the following question: "If there was an adapter and it was readily available, why wasn't the temporary pacer for Manchester[5] being used during the five hours the patient was in the [Saint Francis] emergency department?" (Footnote added.) Cabral responded: "I can't speak to that."

An excerpt from the submitted deposition transcript of Loreen Williams, the patient's attending nurse who was present in the cardiac intensive care unit during the medical incident, also focused on the absence of the requisite adapter. Williams testified: "I'm only aware that the adapter exists now. I did not know at the time that the adapter existed." When asked about the actions of Gregory Vernon, the charge nurse on duty in the unit, Williams testified: "I also know [charge nurse Vernon] was there at the very end when the wires were finally connected . . . . Yes, he knew we were trying to connect them, and he knew how we were trying to connect them. He left, and came back, and he congratulated [the plaintiff] once they were connected. . . . He reappeared shortly thereafter as the connections were being made and the patient was being paced. We congratulated [the plaintiff] on a job well done, and it would have been horrible if she wasn't there . . . ."

As additional support for her objection to the defendants' motion for summary judgment, the plaintiff submitted an excerpt from the deposition transcript of Dr.

Aneesh Tolat, the electrophysiologist who, according to the June 6, 2012 disciplinary action form, allegedly "was very disturbed and made it clear that [the plaintiff's] action was inappropriate and unacceptable." When asked about the comments ascribed to him on the personnel/human resources form, Dr. Tolat testified at his deposition: "No, I asked the nurse who was taking care of the patient in the morning to contact the nurse manager because this was something I have never seen before, and in general not an acceptable form of care, so I did state to that nurse, and I had no idea who this other nurse [who cut the plastic sheathing] was or who the parties were involved with this, that this in general is not a common occurrence and because of its—and in ten years of practice I have never seen anybody strip a wire and I have never heard of it in any professional organizational type meetings."

The issue, then, is whether the allegations in the plaintiff's complaint and the documents submitted in connection with her objection to the defendants' motion for summary judgment were sufficient to demonstrate the existence of a genuine issue of material fact as to whether her discharge was in violation of an important public policy. Before making that determination, however, the defendants' claim that the plaintiff never identified an important public policy must first be addressed. The complaint clearly alleges that "[s]aving a person's life is a substantial public policy," and that "[t]he [d]efendants' attempt to cover up their liability exposure, by firing the one person who stepped up to the plate to save a man's life, is improper and violates public policy." As a preliminary matter, therefore, it must be determined whether saving a patient's life under the circumstances as alleged in this case can constitute a strong public policy that would preclude the plaintiff's discharge on the basis of such conduct. I conclude that it does.

In their motion for summary judgment, the defendants argued that the plaintiff cited no "explicit statutory or constitutional provision" in support of her claim that saving lives constitutes an important public policy. (Emphasis omitted.) The trial court agreed that the plaintiff failed to cite "a relevant public policy that was violated by her termination under the circumstances." Although the plaintiff did not refer to a statute or constitutional provision with respect to this claim, I conclude that her dismissal for the saving of the patient's life, as alleged, would constitute a discharge in violation of a judicially conceived notion of public policy. See *Gagnon* v. *Housatonic Valley Tourism District Commission*, supra, 92 Conn. App. 844.

It is not surprising that there is no legislation or constitutional provision that explicitly confirms that saving a person's life, if possible, constitutes a sound public policy in the state of Connecticut. It would seem

unnecessary to legislate the foundational mission of saving life shared by attending medical staff when a patient is failing while in emergency care, for lack of the appropriate medical equipment. As stated by our Supreme Court in *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 85, 700 A.2d 655 (1997), a case in which the plaintiff claimed wrongful termination of employment for his refusal to travel to Bahrain at the time a travel advisory had been issued by the United States Department of State, "*common sense and human experience* dictate that the plaintiff's assignment to . . . Bahrain could pose a significant threat to the plaintiff's safety and welfare."[6] (Emphasis added.)

Having determined that saving a person's life can constitute an important public policy, I now look to the allegations in the plaintiff's complaint and the documents submitted in connection with her objection to the defendants' motion for summary judgment to determine whether they were sufficient to demonstrate the existence of a genuine issue of material fact as to whether her discharge was in violation of that public policy. Although the plaintiff's complaint alleges a sufficient claim for wrongful discharge in violation of an important public policy, the defendants maintain that there is no genuine issue of material fact because her employment was terminated for her violation of the hospital's policy prohibiting the alteration of medical equipment. The *reason* for the plaintiff's discharge clearly is in dispute. Because this is the defendants' motion for summary judgment, they must demonstrate the absence of a genuine issue of material fact.

"[T]he burden of showing the nonexistence of any material fact is on the party seeking summary judgment . . . . It is not enough for the moving party merely to assert the absence of any disputed factual issue; the moving party is required to bring forward . . . evidentiary facts, or substantial evidence outside the pleadings to show the absence of any material dispute." (Internal quotation marks omitted.) *Mills* v. *The Solution, LLC*, 138 Conn. App. 40, 62, 50 A.3d 381, cert. denied, 307 Conn. 928, 55 A.3d 570 (2012). "[W]hen documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue." (Internal quotation marks omitted.) *Rockwell* v. *Quintner*, 96 Conn. App. 221, 229–30, 899 A.2d 738, cert. denied, 280 Conn. 917, 908 A.2d 538 (2006).

In the most recent guidance of a panel of this court: "Summary judgment should be denied where the affidavits of the moving party do not affirmatively show that there is no genuine issue of fact as to all of the relevant issues of the case. . . . Accordingly, the rule that the party opposing summary judgment must provide evidentiary support for its opposition applies only when

the moving party has first made out a prima facie case for summary judgment. . . . [I]f the party moving for summary judgment fails to show that there are no genuine issues of material fact, the nonmoving party may rest on mere allegations or denials contained in his pleadings." (Internal quotation marks omitted.) *Capasso* v. *Christmann*, 163 Conn. App. 248, 259, A.3d (2016).

On the basis of the record in this case, as detailed in this opinion, I conclude that the court improperly granted the defendants' motion for summary judgment as to this claim because a genuine issue of material fact exists as to the reason for the plaintiff's discharge. "Even assuming that the plaintiff faces a difficult challenge in ultimately proving its case at trial, that assumption cannot form the basis for granting a motion for summary judgment. So extreme a remedy as summary judgment should not be used as a substitute for trial or as a device intended to impose a difficult burden on the non-moving party to save his [or her] day in court unless it is clear that no genuine issue of fact remains to be tried." (Internal quotation marks omitted.) *Mott* v. *Wal-Mart Stores East, LP*, 139 Conn. App. 618, 631, 57 A.3d 391 (2012). For these reasons, I would reverse the trial court's judgment with respect to the plaintiff's count alleging wrongful discharge in violation of an important public policy.

Accordingly, I respectfully dissent.

[1] The plaintiff had argued that the "rescue doctrine" supported a public policy for saving lives. "The rescue doctrine was first promulgated by Cardozo, J., in *Wagner* v. *International R. Co.*, 232 N.Y. 176, 133 N.E. 437 (1921), in which the court stated: 'Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. . . .' (Citations omitted.) Id., 180." *Zimny* v. *Cooper-Jarrett, Inc.*, 8 Conn. App. 407, 411–12, 513 A.2d 1235, cert. denied, 201 Conn. 811, 516 A.2d 887 (1986).

Our Supreme Court established the rescue doctrine in Connecticut in *Cote* v. *Palmer*, 127 Conn. 321, 16 A.2d 595 (1940). After quoting from § 472 of the Restatement of Torts (1934) that "[i]t is not contributory negligence for a plaintiff to expose himself to danger in a reasonable effort to save a third person or the land or chattels of himself or a third person from harm"; id., 326–27; the court stated that "[t]he law cannot leave out of account the ordinary attributes of human nature . . . and it condones conduct in the face of sudden emergency which it would otherwise condemn." (Internal quotation marks omitted.) Id., 327–28.

The trial court in the present case concluded that the rescue doctrine was applicable only when determining whether a rescuer's contributory negligence should be excused. According to the court: "The rescue doctrine does not constitute a public policy for the purposes of an exception to the at-will employment doctrine, nor is it clear how the rescue doctrine is applicable to the circumstances of the plaintiff's case."

[2] The trial court clearly understood the plaintiff's claim of an important public policy to include the saving of lives. As stated in the memorandum of decision, "Essentially, the plaintiff contends that she was punished for her life-saving act . . . ."

[3] I also note that inadequate briefing does not prohibit a reviewing court from addressing an issue; we simply may decline to address it. *Deutsche Bank National Trust Co.* v. *Shivers*, 136 Conn. App. 291, 292 n.2, 44 A.3d 879 (claim not briefed on appeal deemed abandoned, and court may decline to review it), cert. denied, 307 Conn. 938, 56 A.2d 950 (2012). The majority's decision not to review a claim on the basis of inadequate briefing is discretionary in nature. *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004).

[4] The trial court noted that these documents consisted of the "uncertified, excerpted deposition testimony" of various medical staff at the defendants' facility. Nevertheless, the court did not exclude consideration of those submissions by the plaintiff. Moreover, in response to questioning by this court during oral argument, the defendants' counsel stated that it *did* appear that the court considered those excerpts, on the basis of its reference to them in the memorandum of decision, and that the court considered everything submitted by the plaintiff in connection with her objection to the motion for summary judgment.

"Because the trial court appears to have considered all the materials . . . and no challenge appears to have been made, we likewise will consider the substance of the materials presented." *Li* v. *Canberra Industries*, 134 Conn. App. 448, 455 n.4, 39 A.3d 789 (2012).

[5] The patient was transported from Manchester Memorial Hospital to the defendants' facility.

[6] Moreover, even if not directly related to employment claims, the rescue doctrine and General Statutes § 52-557b, Connecticut's good Samaritan law, at the very least are reflective of a recognized policy that those individuals who put themselves at risk in order to render emergency assistance to others merit protection from liability if certain adverse consequences occur.

Also, as pointed out in *State* v. *Duhaime*, 33 Conn. Supp. 129, 138–39, 365 A.2d 837 (1976), warrantless searches by law enforcement officers have been judicially sanctioned when entry was made to save lives. See *Vauss* v. *United States*, 370 F.2d 250, 252 (D.C. Cir. 1966); *United States* v. *Dorman*, 294 F. Supp. 1221, 1225 (D. D.C. 1967).

Connecticut additionally recognizes a "public safety exception" to admit statements given in the absence of being advised of *Miranda* rights. *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). As stated in *State* v. *Betances*, 265 Conn. 493, 503, 828 A.2d 1248 (2003), "[s]everal state and federal courts in other jurisdictions . . . have applied the public safety exception to situations involving a concern for an individual's safety, including police officers, victims and defendants." The court held: "We agree with these courts that the public safety exception applies to individual members of the public, including defendants, as well as to the public at large." Id., 504; see also *State* v. *Bardales*, 164 Conn. App. 582, 591,      A.3d      (2016) ("concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*").